Robert Gordon, et al., Plaintiffs-Appellants, v. Thor Power Tool Company, Defendant-Appellee.

Gen. No. 64–56.

Second District.

March 2, 1965.

George Christensen and David H. Armstrong, of Aurora, for appellants.

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of Chicago (Edward R. Lev and Arthur J. Kowitt, of counsel), for defendant.

DAVIS, J.

Plaintiffs filed this suit as a class action on behalf of all the members of Lodge 236 of District No. 108 International Association of Machinists, herein called "Union," against the Thor Power Tool Company, herein called "Company," seeking an accounting and a payment over to plaintiffs of their share of certain premium refunds received by the Company from the insurer carrying the group insurance plan for the Company's employees. The Company moved to dismiss the complaint on the ground that the substance of the suit was subject to arbitration under the collective

bargaining agreement entered into between the Company and Union, and that plaintiffs could not bring this suit without first exhausting the grievance and arbitration procedures provided in the collective bargaining agreement. The trial court agreed, dismissed the complaint and this appeal followed.

The complaint, motion to dismiss and affidavit attached thereto, and the several exhibits, reflect the following facts: The Union, at all times since 1950, has been the bargaining agent for plaintiffs and has been a party to a collective bargaining agreement, on behalf of the plaintiffs, with the Company. Pursuant to this agreement, the Company has always provided group life and accident insurance for its employees, and paid a portion of the insurance premiums. During the policy years ending May, 1951, through May, 1960, the employees contributed 40% of the premiums for their own insurance, and thereafter, 25% of the total premium. The employees paid all of the premiums for the coverage for their dependents.

The portion paid by the employees was governed by the collective bargaining agreement, Article X of which provided: "The Company will pay 75% of the employee premiums for the group insurance benefits set forth in Appendix DD attached hereto." The Company at all times paid the insurance premiums to the insurer and obtained the employees' share of the premiums through payroll deductions. At the end of each policy year the insurer reviewed the loss experience and, when warranted, refunded a portion of the premiums by applying a retroactive rate credit. During each of the policy years, beginning with the year ending May 31, 1951 through the year ending May 31, 1961, a retroactive rate credit was given and a portion of the premium ultimately refunded.

The total refunded premiums during this period was $113,064.70. The employees' share (40% of re-

funds for the years 1951 through 1961 and 25% of the refund for the year 1961) totaled $38,847.34. The Company at no time paid over to the employees their share of the refunds received. Nor does it appear that the Company at any time, until this dispute arose, advised the employees, or the Union, of the amount of refunds received, or of the employees' share. The Company apparently deposited these refunds with its general corporate funds.

The Company did, however, keep records of the premiums refunded and the employees' share thereof; and while it did not pay over these refunds when received, it accumulated them, and from time to time paid them over by crediting the payroll deductions otherwise made for the employees' share of premiums. The result, of course, was that the payroll deductions made for insurance premiums were at those times, thus reduced. Of the $38,847.34, the sum of $18,871.68 was used to pay the employees' share of subsequent premiums and $19,975.66 remained to be distributed at the time of this dispute.

The insurance company determined that for the year ending May 31, 1962, there would be no premium refund and that there was a retroactive rate debit, rather than credit, in the sum of $15,373.05. For this reason the insurer increased the annual premium and, on September 5, 1962, advised the Company of this increase, and that the new premium rates were to be retroactive to the beginning of the policy year, June 1, 1962. The Company did not inform the employees or the Union of the premium increase until November 28, 1962. At this time, it advised the Union and the employees of the retroactive premium increase, of the $19,975.66 accumulated for the employees' benefit by reason of premium refunds, and that a portion of this sum would be used to defray the employees' share of their monthly premiums, including their retroactive

increase, thereby reducing the employees' share of refunded premiums to $8,188.94.

A series of letters ensued between the Company and the Union. In these letters, the Union advised the Company that the November 28 notice was the first information furnished by the Company to the Union that the Company possessed unused premiums belonging to the employees; that the employees were not liable for any of the increased premiums for the period between June 1, 1962 and December 31, 1962, but would thereafter pay their share of the increased premiums; and that the employees' share of the refunded premiums should be immediately refunded to them. The Company, throughout the correspondence, requested that the entire matter be submitted to arbitration under the collective bargaining agreement. The Union, throughout, denied that the matter was arbitrable.

While several peripheral questions arise in the decision of this case, the ultimate questions to be determined by the Court are: whether the subject matter of this suit is within the scope of those things to be arbitrated under the collective bargaining agreement between the Union and the Company, and, if so, may the plaintiffs bring this suit without first exhausting their remedies under the agreement.

The law is settled that a court, not an arbitrator, should determine the arbitrability of this dispute under the collective bargaining agreement. Section 301(a) of the Labor Management Relations Act (1947–61 Stat 156, 29 USC § 185(a)), so provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States. . . ." Also see United Steelworkers v. Warrior & Gulf Navigation Co., 363 US 574, 582, 4 L Ed2d 1409, 1417; Atkinson v. Sinclair Refining Co., 370 US 238, 241, 8 L Ed2d 462,

466 (1962); Piano and Musical Instrument Workers Union Local 2549 v. W. W. Kimball Co., 333 F2d 761, 765 (CA 7th, 1964).

 Section 301(a) is not merely jurisdictional. In addition to assigning to federal district courts jurisdiction in controversies that involve labor organizations in industries affecting commerce, it authorized federal courts to fashion a body of federal substantive law for the enforcement of collective bargaining contracts. Textile Union of America v. Lincoln Mills of Ala., 353 US 448, 451, 1 L Ed2d 972, 977 (1957). By virtue of this section, if a suit involves the construction, interpretation, application or enforcement of a collective bargaining agreement, these matters are to be determined in accordance with the federal substantive law as opposed to state law. Whether one has a duty to arbitrate, as well as what issues one must arbitrate, under the provisions of a collective bargaining agreement, is to be decided under this body of federal substantive law. United Steel Workers v. Warrior & Gulf Navigation Co., 363 US 574, 578, 579, 4 L Ed2d 1409, 1414, 1415 (1960); Atkinson v. Sinclair Refining Co., 370 US 238, 241, 8 L Ed2d 465, 466 (1962); Zdanok v. Glidden Co., Durkee Famous Foods Division, 327 F2d 944, 950 (CA 2d, 1964).

 Section 301 did not preempt to federal district courts jurisdiction over actions involving the construction or enforcement of collective bargaining agreements. The various state courts exercise concurrent jurisdiction with the federal courts in suits involving collective bargaining agreements, but, by virtue of Section 301, the state courts, when exercising such jurisdiction, apply the federal substantive law. Packinghouse Workers v. Needham Packing Co., 376 US 247, 250, 11 L Ed2d 680, 683 (1964); Atkinson v. Sinclair Refining Co., 370 US 238, 246, 8 L Ed2d 462, 468 (1962).

395

■ The duty of this court to apply federal substantive law when interpreting a collective bargaining agreement does not depend on which party raises the issue or in what manner it is brought before the court. There need not be a recitation that the suit is brought under, or involves, Section 301 of the Labor Management Relations Act. Humphrey v. Moore, 375 US 335, 343, 344, 11 L Ed2d 370, 378 (1964).

■ Nor does it matter that the employee members of the Union, rather than the Union, are parties to the suit. To remove individual claims involving the interpretation and enforceability of collective bargaining agreements from the ambit of Section 301 "would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law." If state law were to apply when individual union members, as opposed to the union itself, are parties to the litigation, the uniformity, in interpretation and meaning of collective bargaining contracts sought by Congress in the enactment of Section 301, would be lost. Smith v. Evening News Ass'n, 371 US 195, 200, 201, 9 L Ed2d 246, 251 (1962).

The Supreme Court of the United States has pointed out that this federal substantive law is based on the policy reflected in our national labor laws, to promote industrial stabilization through the collective bargaining agreement. A major factor in achieving industrial peace is the provision for the arbitration of grievances contained in these agreements. A collective bargaining agreement, which is a generalized code to govern a myriad of unanticipated cases, involves too many people, too many problems, and too many unforeseeable contingencies to provide for every situation which might arise. The agreement thus does not seek to define every duty and right of the parties to it.

Arbitration in the labor case is not a substitute for litigation, but a substitute for industrial strife. It is a part of the machinery necessary for the system of industrial self-government. It calls into being a new common law—the common law of a particular industry or plant.

The philosophy underlying this principle is stated in Warrior & Gulf Navigation Co., 363 US 574, 581, 582, 4 L Ed2d, at pages 1416, 1417, as follows:

> "Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all of the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement. . . .

> "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."

It is abundantly clear that federal policy recognizes, that only through arbitration can the parties be assured· that disputes can be determined, not only on the expressed provisions of the contract, but also by someone

with a particular knowledge of a given industry, trade or company, to the end of attaining the goal of uninterrupted production under the collective bargaining agreement.

 While the duty to arbitrate a particular matter can only arise from the contract itself, under the federal substantive law, the impressive policy considerations of the National Labor Relations Act require an interpretation in favor of arbitration if the contract is susceptible of such construction. John Wiley & Sons, Inc. v. Livingston, 376 US 543, 550, 11 L Ed2d 898, 905; Communications Workers of America v. New York Tel. Co., 327 F2d 94, 96 (CA 2d, 1964); Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F2d 644, 645 (CA 2d, 1962).

In encompassing the scope of the grievance and arbitration provisions of the collective bargaining agreement and the extent of its coverage, the courts have painted with a wide brush. In Warrior & Gulf Navigation Co., 363 US at 581, 583, 4 L Ed2d, at pages 1417, 1418, the Court stated:

> "Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefor come within the scope of the grievance and arbitration provisions of the collective agreement. . . . An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

The collective bargaining agreement in this suit provides, in Article IV, that, "Should difference arise between the Company and the Union, with regard to the meaning or interpretation or application of the provisions of this Contract, resulting in a dispute or

grievance, it is agreed that there shall be no stoppage of work by reason of such dispute or grievance and negotiations to settle such dispute or grievance shall be carried forth in the following manner. . . ." After setting forth the grievance procedure, this Article then provides, ". . . If no settlement is reached in this manner the disputes or grievances may be submitted to arbitration in the manner provided for in Article V of this Contract."

The provisions relating to grievances and disputes, and their submission to arbitration, are the standard, broad type provisions. The contract, by its express terms, does not purport to exclude any dispute from the coverage of its grievance and arbitration provisions. In view of the strong presumption favoring arbitrability, it would be folly for this Court to attempt to read into this contract the exclusion of the dispute under consideration.

 The money the plaintiffs seek to have returned, is a refund of the premiums they paid pursuant to the collective bargaining agreement for insurance the Company obtained pursuant to this same agreement. The money had been retained and applied against future premium payments by the Company under a practice of long standing, albeit a practice of which the Union was apparently totally unaware. A portion of the money plaintiffs now seek, is no longer held by the Company, having been used to pay the plaintiffs' portion of the retroactive premium increase, an obligation the Company claims is imposed on the plaintiffs by Article X of the contract. The claims of both the plaintiffs and defendant in and to said money, arose under the collective bargaining agreement and are subject to the arbitration provisions therein. Consequently, this Court holds that this dispute is arbitrable.

■■ Having concluded that the dispute between the parties is arbitrable, the remaining question is whether the plaintiffs must exhaust their contractual remedies before resort may be had to the courts. The question of exhaustion of the administrative or contractual remedies must be determined by Illinois law. Anson v. Hiram Walker & Sons, Inc., 222 F2d 100, 104; Payne v. Pullman Co., 13 Ill App2d 105, 111, 141 NE2d 83 (1st Dist 1957). In Illinois, it is well settled that where a member of a union or association brings suit and it appears that his remedies are governed by laws and regulations or contractual limitations, of the association to which he belongs, he must first show that he has exhausted all of the remedies so provided. This rule applies to procedures outlined in the collective bargaining agreement, and the complaint must show on its face that the grievance procedures therein provided for were followed and exhausted. Without such a showing, a resort may not be had to the courts for relief. Webster v. Midland Elec. Coal Corp. 43 IllApp2d 359, 369, 193 NE2d 212 (2d Dist 1963); Long v. Illionis Cent. R. Co., 32 Ill App2d 103, 109, 110, 176 NE2d 812 (3rd Dist 1961); Payne v. Pullman Co., supra at 111, 112; Anson v. Hiram Walker & Sons, Inc., supra at 104.

■■ The fact that the contract here in question refers to the submission of arbitration in permissive language, by stating that if the parties cannot reach a settlement of their disputes they "may" submit them to arbitration, does not alter the doctrine of exhaustion of remedies. The exercise of a right to appeal is always permissive, but under the doctrine of exhaustion of remedies, the course to be taken in the exercise of the right, is mandatory. Payne v. Pullman Co., supra at 117.

The plaintiffs, who were of the opinion that the subject matter of this suit was not bottomed on the col-

lective bargaining agreement, did not first exhaust the grievance and arbitration procedures set forth therein, and, of course, made no such allegation in their complaint. The order of the trial court dismissing the complaint because of plaintiffs' failure to exhaust the administrative remedies under the collective bargaining agreement is, accordingly, correct.

Judgment affirmed.

ABRAHAMSON, P. J. and MORAN, J., concur.